## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**JAMES E. DAVIS AND FRANCOIS KOHLMANN,**
**INDIVIDUALLY AND ON BEHALF OF ALL**
**OTHERS SIMILARLY SITUATED**                    **PLAINTIFFS**

**vs.**                          **CIVIL ACTION NO. 3:11-CV-093-MPM-SAA**

**ACA FINANCIAL GUARANTY**
**CORPORATION, and**
**JOHN DOES One through Ten**                    **DEFENDANTS**

### FIRST AMENDED CLASS ACTION COMPLAINT
### JURY TRIAL DEMANDED

Come now Plaintiffs, James E. Davis and Francois Kohlmann ("Plaintiffs"), individually and on behalf of all others similarly situated, and file this Complaint against the above-named Defendant, as follows:

### PARTIES

1.      Plaintiff James Davis is a resident citizen of Lafayette County, Mississippi.

2.      Plaintiff James Davis is currently the owner/holder of securities identified by CUSIP No. 20786LCS8 which were insured by ACA under policy No. 50601-15.

3.      Plaintiff Francois Kohlmann is a resident citizen of Palm Beach County, Florida.

4.      Plaintiff Francois Kohlmann is currently the owner/holder of securities identified by CUSIP Nos. 20786LCS8 which were insured by ACA under Policy No. 50601-15.

5.      Defendant ACA Financial Guaranty Corporation is a foreign insurance company incorporated in the State of Maryland with its principal place of business at 7 Saint Paul Street, Suite 1660, Baltimore, Maryland 21202.

6.     Defendant(s) John Does One through Ten are companies, individuals, or entities whose identities and/or proper corporate names are currently unknown.   All allegations and claims asserted herein against Defendant ACA are incorporated by reference against Defendant(s) John Does One through Ten. If necessary and appropriate, said John Doe Defendant(s) will be identified by proper name and joined in this action pursuant to the Federal Rules of Civil Procedure when such identities are discovered.

## JURISDICTION AND VENUE

7.     The provisions of the Class Action Fairness Act ("CAFA") establish original jurisdiction of the Federal Courts of any class action in which any member of the plaintiff class is a citizen of a State different from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000, exclusive of interest and costs.   Plaintiffs allege that the total claims of individual class members in this action are well in excess of $5,000,000 in aggregate exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2), (5).   Plaintiffs and other members of the class are citizens of states other than the state of Maryland, where ACA resides.   Furthermore, Plaintiffs allege that the total number of members of the proposed Class is believed to be greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).   Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A).

8.     Venue in this district is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged occurred in this district, Plaintiff James Davis resides in this District, and ACA is subject to personal jurisdiction in this District.

## FACTS

9.      Connector 2000 Association, Inc. ("Connector") is a special purpose entity that was created solely to develop and operate the Southern Connector Toll Road Project (the "Project") in Greenville, South Carolina.

10.      Pursuant to a Master Indenture, the Project was to be funded by the issuance of several series of revenue bonds (the "Original Bonds") totaling $200,177,680.

11.      The Original Bonds were issued on February 11, 1998, and identified by CUSIP number 20786LAA9,   20786LAG6, 20786LAQ4, 20786LAR2, 20786LAU5, and 20786LAW1.

12.      ACA is a Maryland domestic property and casualty insurance company that was incorporated under the laws of Maryland on June 25, 1986.

13.      ACA obtained its original Certificate of Authority to conduct the business of insurance in the State of Maryland on September 11, 1986.   Under its Articles of Incorporation, ACA was formed for the purpose of engaging in the business of issuing financial guaranty insurance, municipal bond insurance and credit enhancement insurance.

14.      ACA assures the general public that "[its] guaranty gives investors additional security of knowing that in a default, debt service will be unconditionally met in a timely manner."

15.      On June 5, 2001, ACA issued seven secondary market insurance policies ("the Policies") which insured $42,700,000 of the Original Bonds issued by Connector 2000.

16.      ACA accepted "non-refundable" premiums to insure these bonds.

17.      New securities were created in the process.   The "Insured Bonds" were assigned, and identified by, unique CUSIP numbers:   20786LCS8, 20786LCU3, 20786LCV1,

3

20786LCW9, 20786LCX7, and 20786LCY5. The insured bonds were sold and traded under these CUSIP numbers.

18.     Except as to the identity of the particular securities insured and the policy numbers assigned, the provisions of the ACA "SECONDARY MARKET INSURANCE POLICIES" (the "Policies"), that insured the class members' securities are identical.

19.     The Policies require ACA to pay the "Amount Due for Payment" resulting from the "nonpayment" by the Issuer of the "Obligations" "described in Exhibit A" to the Policies.

20.     "Non-payment" is defined under the Policies to mean a specified written notice from the Bond Custodian to the Issuer.

21.     The Policies define "Amount Due for Payment" as the amount of Nonpayment as reduced, if applicable, by the amount of any partial payment made by or on behalf of the Issuer.

22.     The Policies define the "obligations" as "the *securities* insured under the Policy, as described in Exhibit A, attached hereto."

23.     The Policies' "Exhibit A" identifies the "securities insured under [each] policy."

24.     Each insurance policy identifies two "securities insured under the policy."

25.     Each policy defines the "obligations" to include two unique securities.

26.     The certificates of insurance provide that the insurance provided by ACA was "unconditional and irrevocable."

27.     The Policies do not exclude coverage for non-payment caused by the bond issuer's discharge, or release, in bankruptcy or otherwise.

28.     The Policies do not exclude coverage in the event that any of the securities identified in Exhibit A of the Policies are cancelled.

4

29.     The Policies do not exclude coverage in the event that any of the securities identified in Exhibit A of the Policies are exchanged.

30.     The Policies do not exclude coverage in the event that Connector 2000 is discharged in Bankruptcy.

31.     The Policies do not exclude coverage in the event that Connector 2000 is released of its obligations under the Original Bonds.

32.     ACA's obligation to pay under the Policies is conditioned only upon its receipt of a specified notice that satisfied the requirements for payment under the Policies.

33.     ACA gave advance consent to any arrangement that would release Connector 2000 or otherwise impair ACA's ability to collect.

34.     The Policies provide that they are "noncancellable," unless the Holder as owner "surrenders the interest in the Certificate of Bond Insurance or in the Position, (as the term "Position" is defined in the Custody Agreement) and waives its right to receive payment from the Insurer under this Policy, pursuant to Sections 3.03 (f) and 4.06 (b) of the Custody Agreement."

35.     None of the class members surrendered their interests in the Certificates of Bond Insurance.

36.     None of the class members surrendered their interest in their Positions.

37.     None of the class members waived their right to receive payments from ACA.

38.     The Policy expressly incorporated, and was "subject to," the November 3, 1997 Custody Agreement between the predecessors of US Bank Trust National Association ("US Bank") and ACA (hereafter "the Custody Agreement").

39.     Under the Custody Agreement, US Bank as Bond Custodian ("Custodian") was

5

obligated to "hold the Insured Obligations and the Policies in custody" and was prohibited from disposing of same except by the specific protocol provided in the Custody Agreement or by order of a court with competent jurisdiction.

40.     The Custody Agreement defined "Insured Obligations" as obligations deposited with the Custodian pursuant to the Custody Agreement for which a related Certificate of Bond Insurance has been issued or a related position created."

41.     Each Certificate of Bond Insurance identified the Insured Obligations as the "Insured CUSIP."

42.     The "insured CUSIP"s identified in the Certificates of Bond Insurance were 20786LCS8, 20786LCU3, 20786LCV1, 20786LCW9, 20786LCX7, and 20786LCY5.

43.     The Bond Custodian did not dispose of the class members' Insured Obligations.

44.     The Bond Custodian did not dispose of the Policies in its custody.

45.     Both the Policies and the Custody Agreement give ACA broad powers to protect its interests whenever the underlying obligation became the subject of legal proceedings.

46.     Under the Policies, and as a condition of ACA's payment, ACA was required to be appointed to act "as agent for the Holder or Owner" in any legal proceedings relating to the Obligations."     Specifically, the Policies provided:

> In any event of Nonpayment, the Custodian shall make a claim for payment under this Policy. *In order to receive payment hereunder*, the Custodian as the attorney in fact of the Holder or Owner, as the case may be, shall execute and deliver appropriate instruments of assignment to the Insurer and shall appoint the Insurer *as the agent of such Holder or Owner* and of the Custodian *in any legal proceedings* relating to the Obligations.

47.     Section 4.07 of the Custody Agreement specifically applied these powers to

6

"Insolvency Proceedings" commenced by the bond issuer.

48.     ACA provided form letters to the Custodian and instructed the Custodian to send the form correspondence to ACA in the event that Connector 2000 failed to make scheduled payment.

49.     ACA represented to the bond custodian that delivery of the correspondence would satisfy the requirement for payment under the Policies.

50.     Historically, the majority of ACA's business was insuring obligations issued by municipalities.

51.     Beginning in 2002, however, ACA began writing guarantees on the performance of collateral debt obligations (CDOs) backed by portfolios of financial assets.

52.     CDOs are credit derivative contracts which are a variation of "credit default swaps," in which a buyer makes payments to a seller and in return receives a payoff if an underlying transaction defaults.

53.     CDOs are not insurance, are not traded on any exchange, and are not required to be reported to any governmental agency.

54.     The lack of transparency, coupled with the size of the credit default swap market, created a substantial risk to the American economy.

55.     Because ACA was not directly involved with the CDOs' underlying investments, it was essentially betting as to whether the underlying investments would succeed or fail.

56.     The financial assets that ACA guaranteed included transactions with a par value of approximately $22 billion backed by bundles of subprime mortgages.

57.     As a result of the meltdown of the sub-prime mortgage market, many of the

7

underlying investments guaranteed by ACA failed.

58.     In November 2007, ACA was notified that its "A" financial strength and financial enhancement rating had been placed on credit watch with negative implications. A downgrade to "BBB+" or lower could have had dire consequences for ACA. In the event of a downgrade, ACA's swap counterparties could require ACA to post collateral in an amount approximately equal to unrealized mark-to-market losses, which at the time were estimated to be approximately $1.7 billion. ACA would not have had sufficient assets to post this collateral, had they been demanded to do so by these counterparties.

59.     One of the primary announced objectives of the restructuring was to "provide significant protection to ACA's municipal policyholders." However, the interests of ACA's new leadership placed its policyholders in jeopardy.

60.     As a result of negotiations with its counterparties and certain other policyholders and creditors, ACA proposed, and realized, a restructuring transaction with the approval of the Maryland Insurance Commissioner. Under the settlement, the counterparties released potential claims against ACA in exchange for a cash payment and surplus notes issued by ACA. The Surplus Notes were issued in the aggregate principal amount of $1 Billion. Upon maturity, the owners of the Surplus Notes are entitled to the face value, except that the Surplus Notes are subordinate to claims paid to policyholders, including the class members.

61.     Accordingly, the Surplus Note holders have a direct pecuniary interest in ACA's ability to avoid payment on its obligations to policyholders, including the class members.

62.     Under the settlement, the Surplus Note holders were empowered to direct the decisions of ACA. By virtue of the Settlement Agreement, the Surplus Note Holders were

permitted to nominate new members of the board of directors and ACA's shareholders were required to elect them.

63. Upon information and belief, the persons who directed ACA to deny the claims of the class members were nominated by the Surplus Noteholders, who stand to directly gain from any monies not paid to policyholders.

64. As a result of the settlement, ACA was also required to operate as a runoff guaranty insurance company. As such, ACA was permitted to issue new policies only with permission from the Maryland Commissioner of Insurance, and only for obligations whose maturity dates did not extend past the last maturity date of bonds already insured.

65. In January 2010, "nonpayment" occurred.

66. The Bond Custodian sent "nonpayment" correspondence designed by ACA to ACA.

67. ACA received notice of nonpayment in a form that satisfied the requirements for payment under the Policies.

68. ACA paid the amounts due in January 2010.

69. Thereafter, upon information and belief, ACA notified Connector 2000 of its subrogation claim for amounts it paid.

70. On June 24, 2010, Connector 2000 filed a petition for bankruptcy protection under Chapter 9 of U.S. Bankruptcy Code for the Southern District of South Carolina.

71. In June 2010, "nonpayment" occurred.

72. ACA received notice of nonpayment in a form that satisfied the requirements for payment under the Policies.

73.     ACA paid the amounts due in June 2010.

74.     On September 22, 2010, ACA filed a notice of claim against Connector 2000 in the bankruptcy proceedings.

75.     In January of 2011, "nonpayment" occurred.

76.     ACA received notice of non-payment in a form that satisfied the requirements for payment under the Policies.

77.     On January 17, 2011, Connector 2000 filed an amended plan for adjustment of debts that included an exchange of original bonds.

78.     The "insured bonds" – identified by Enhanced CUSIP numbers – were not among the bonds scheduled for cancellation under the Amended Plan.

79.     Nevertheless, once ACA learned that Connector 2000 intended to exchange the original bonds, ACA developed a plan intended to eliminate any liability it had under the policies.

80.     ACA decided that it would intentionally not pursue claims against Connector 2000 and that it would not seek to protect its subrogation rights for payments that it made prior and during the bankruptcy proceedings.

81.     ACA decided that it would simply pay the amounts that became due during the bankruptcy and thereby indicate its intention to continue to make payment as the original bonds required.

82.     ACA decided that, despite the fact that the Policy "irrevocably and unconditionally" guaranteed payment for both the Original and Insured Bonds, ACA would characterize its insurance as applying only to the Original Bonds identified by the Original

10

CUSIP.

83.     ACA decided that, despite the fact that its payment obligations were conditioned only on receipt of notice from the Bond Custodian, ACA would base its decision not to pay on the position that notice did not trigger its payment obligation under the Policies.

84.     ACA decided that it would blame the Bondholders and the Bond Custodian for not assigning ACA the right to represent their interests in the Bankruptcy Proceedings when ACA had already been appointed as agent and despite the fact that ACA chose not to participate in the Bankruptcy Proceedings.

85.     ACA decided that it would base its decision not to pay on the Bond Custodian's failure to demand accelerated payments on behalf of all bondholders prior to the entry of the Bankruptcy Plan Confirmation Order, even though the Policies and the Certificates of Insurance left the decision of whether to pay accelerated amounts to ACA's "sole discretion."

86.     These frivolous and bad faith decisions and positions were motivated by the selfish interests of ACA, as directed by the Surplus Note Holders, who stand to gain if ACA is able to avoid payment to the class members.

87.     Aside from filing a notice of claim, ACA took no further action in the Connector 2000 Bankruptcy Proceedings.

88.     ACA had the right to "control all matters relating" to the Bondholders interest in the Connector 2000 Bankruptcy Proceedings pursuant to the Custody Agreement.

89.     ACA's payments in response to "Nonpayment" were conditioned on ACA's receipt of appropriate instruments of assignment and its appointment to act as agent for the Bondholders in any legal proceedings relating to the Obligations.

11

90.     ACA became agent for the bondholders and was allowed to "control all matters" in the bankruptcy proceedings.

91.     ACA received all significant pleadings and orders in the bankruptcy proceedings.

92.     ACA did not exercise its right to "control the proceedings."

93.     ACA did not seek to protect its interests in the Bankruptcy Proceeding.

94.     ACA did not seek to protect the class members' interest in the Bankruptcy Proceedings.

95.     Aside from filing a claim, ACA took no action in the bankruptcy proceedings.

96.     By electing not to participate in the bankruptcy proceeding, ACA consented to any alteration of its rights occasioned by the Connector 2000 Bankruptcy Proceedings.

97.     On July 1, 2011, "nonpayment" occurred.

98.     On or about July 6, 2011, ACA received notice in a form that satisfied the requirements for payment under the Policies.

99.     The form of the July 6, 2011 notice was designed by ACA.

100.    The contents of the July 6, 2011 notice included all information necessary to satisfy the requirements of "Nonpayment" as the term is defined by the Policies.

101.    On July 7, 2011, ACA issued a letter to holders of the "Bonds. . .Bearing CUSIP No. 20786LCS8." Therein, ACA informed that the class members' bonds were "exchanged" "effectively cancelled" and "no longer enforceable objections." ACA then informed that, due to the "cancellations" and "exchange" occasioned by the Connector 2000 Bankruptcy Plan, ACA's "guaranteed obligation is no longer enforceable" and ACA "has no liability under the Policy."

102.    Consistent with its notice of July 7, 2011, ACA has disavowed any obligation to

12

make payment for any "nonpayment" occurring or received after April 1, 2011.

103. The Plaintiffs' insured securities have not been cancelled or exchanged, and were never scheduled to be cancelled or exchanged.

104. The insured bonds continue to be recognized as unique securities under the insured "CUSIP" Nos. 20786LCS8, 20786LCU3, 20786LCV1, 20786LCW9, 20786LCX7, and 20786LCY5.

105. At the time that ACA repudiated its obligation to pay, it knew that these securities had not been cancelled or exchanged.

## CLASS DEFINITION AND REQUIREMENTS

106. Plaintiffs bring this action on their own behalf and as a Class Representatives on behalf of a Class of others similarly situated in accordance with Rule 23 of the Federal Rules of Civil Procedure. The Class upon whose behalf this suit is brought is defined as follows:

> All owners or holders of Connector 2000 Association, Inc. Toll Revenue Bonds (Southern Connector Project, Greenville, South Carolina) bearing CUSIP numbers 20786LCS8; 20786LCU3; 20786LCV1; 20786LCW9; 20786LCX7; 20786LCY5; and 20786LCY5, which were insured under ACA's Secondary Market Policies numbers: S0601-15; S0601-17; S0601-18; S0601-19; S0601-20; S0601-21; S0601-22, respectively.

107. Questions of law and fact are common to all members of the Putative Class as they relate to ACA's position that the class members' insurable interests have been "effectively cancelled" for which ACA has "no further liability or obligation under the Polic[ies]."

108. Plaintiffs seek relief for their own benefit and for the benefit of the members of the putative Class.

109. Based on the size of the original bond issue and the number of years and

transactions that have passed, it is apparent that the number of affected bond holders or owners could be in the thousands thereby making joinder unfeasible.

110.     Questions of law and fact common to the Class exist and predominate over questions affecting only individual members, including, *inter alia*:

    i.    Whether ACA's actions and/or omissions is an anticipatory repudiation of the Policies.

    ii.    Whether the Issuer's bankruptcy eliminated ACA's insurance obligations to the members of the class.

    iii.    Whether ACA is liable under the policies at issue.

    iv.    Whether ACA's actions were carried out in a negligent, intentional, or grossly negligent fashion with a total disregard for the rights of the Class.

    v.    Whether ACA acted in bad faith in refusing to comply with its obligation under the Policies.

    vi.    Whether ACA breached its covenant of good faith and fair dealing owed to the Class under the Policies; and

    vii.    Whether ACA assumed and breached fiduciary duties as agent of the Class members.

111.     Plaintiffs' claims in this action are typical of the claims that would be sought by other Class members and arise from the same course of conduct of ACA.  The relief sought by all class members is common.

112.     The interests of the Class will be fairly represented by the Plaintiffs.  Counsel in this matter is competent and experienced in consumer protection, insurance litigation, and class action litigation.

113.     Certification of this class action is appropriate under F.R.C.P. 23(b).  Questions of law or fact common to the Class predominate over questions of law or fact affecting only

14

individual members. Given the clear predominance of claims, class litigation is superior to any other 1method available for the fair and efficient adjudication of these claims. The cost of litigation through individual lawsuits might exceed expected recovery. Further, certification is warranted given ACA's actions with respect to class members, making it necessary for appropriate redress on behalf of all affected bond owners or holders. Lastly, there is a substantial risk of inconsistent and conflicting adjudications given the large number of affected bond holders or owners.

114. A class action allows all of these claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that such individual actions would be engendered.

## COUNT I

## (BREACH OF CONTRACT)

115. Plaintiffs repeat and reallege all preceding paragraphs, as if fully set forth herein.

116. ACA's "irrevocable and unconditional" guarantee to make payment was conditioned solely on "Nonpayment" defined under the policies as a specified notice.

117. ACA received notice that satisfied all requirements for payment under the Policy.

118. ACA's refusal to pay after receipt of the specified notice constitutes breach of contract.

119. ACA owes duties to the Plaintiff and all class members to pay all amounts due for payment after "Nonpayment" occurred.

120.     ACA's refusal to pay amounts due under the Policies constitutes breach of contracts, entitling Plaintiffs to an award of compensatory damages, punitive damages, attorneys' fees, and costs.

## COUNT II

## (ANTICIPATORY REPUDIATION)

121.     Plaintiffs repeat and reallege all preceding paragraphs, as if fully set forth herein.

122.     In its letter of July 7, 2011, ACA took the position that Connector 2000's Bankruptcy Order relieved ACA of any "further liability or obligation" under the Policies.

123.     ACA confirmed in pleadings before this Court that it has no intention to make payments in response to notification of nonpayment received after April 1, 2011.

124.     ACA publically confirmed in its June 30, 2011 Quarterly Financial Statement that its repudiation applies to all policies that insured the class members' bonds.

125.     ACA's actions and statements are clear, positive, and unequivocal as to its repudiation of obligations it owes under the Policies.   Thus, Plaintiff and the class members are entitled to present recovery of all payments that would have been made in the future if ACA had honored its obligations.

126.     ACA's repudiation of the Policies entitles the Plaintiffs and class members to be awarded compensatory damages, punitive damages, attorneys' fees, and costs.

## COUNT III

## (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

127.     Plaintiffs repeat and reallege all preceding paragraphs, as if fully set forth herein.

128.     All contracts include an implied covenant of good faith and fair dealing.

129.    ACA breached the implied covenant of good faith and fair dealing when it refused to pay the amounts due for payment under the policies based on a supposed "cancellation or exchange" that it knew had not occurred.

130.    ACA breached the implied covenant of good faith and fair dealing, when it disavowed the duty to conduct an objective and reasonable investigation into whether Plaintiffs' securities had in fact been "cancelled or exchanged."

131.    ACA breached the implied covenant of good faith and fair dealing when it reneged on its obligations to protect Plaintiffs and the class members from any adverse effect caused by Connector 2000 bankruptcy.

132.    ACA breached the implied covenant of good faith and fair dealing when it was appointed as agent for the bondholders, but did not act on their behalf.

133.    ACA breached the implied covenant of good faith and fair dealing when it refused to participate in the bankruptcy proceedings, and instead acted only in its self-interest, believing that its inaction would eliminate its liability under the Policies.

134.    ACA breached the implied covenant of good faith and fair dealing when it designed a plan to eliminate its obligations under the Policies.

135.    ACA breached the implied covenant of good faith and fair dealing when it asserted frivolous positions that were plainly inconsistent with the Policies, the Custodian Agreement, and the Certificates of Insurance.

136.    As a result of ACA's breaches of the implied covenant of good faith and fair dealing, Plaintiff and the class members are entitled to an award of compensatory damages, punitive damages, attorneys' fees, and costs.

## COUNT IV

## (GROSS NEGLIGENCE)

137.    Plaintiffs repeat and reallege all preceding paragraphs, as if fully set forth herein.

138.    ACA owed duties to the Plaintiffs and class members to review, investigate, process, and pay their claims before denying the same.

139.    ACA's actions in denying the Policies in their entirety before reviewing, investigating, processing, or paying any claims were reckless and grossly negligent and with knowledge that their actions would cause the class members considerable and additional harm.

140.    As a result of ACA's actions, the Plaintiffs and the class members are entitled to an award of compensatory damages, punitive damages, attorneys' fees, and costs.

## COUNT V

## (BREACH OF FIDUCIARY DUTY)

141.    Plaintiffs repeat and reallege all preceding paragraphs, as if fully set forth herein.

142.    As a condition of payment, ACA was appointed agent in any legal proceeding relating to the insured securities.

143.    ACA paid certain amounts that became due during Connector 2000's Bankruptcy Proceeding.

144.    Once ACA became the bondholders' appointed agent, ACA acquired duties owed outside of the policy, including the duty to protect the bondholders' interests in Connector 2000's Bankruptcy proceedings.

145.    Rather than protect the bondholder's interests, ACA stood silent, hoping that its inaction would enable it to ultimately avoid the obligations owed to its principals.

146.    For these reasons, ACA's acts and omissions give rise to an independent tort.

147.    ACA breached fiduciary duties it owed to the bondholders and the class members as their agent.

148.    ACA's breach of its fiduciary duties entitle Plaintiffs and the class members to compensatory damages, punitive damages, attorneys fees, costs and interest.

## COUNT VI

## (DECLARATORY JUDGMENT)

149.    Plaintiffs repeat and reallege all preceding paragraphs, as if fully set forth herein.

150.    Pursuant to Rules 23(b) and 57 of the Federal Rules of Civil Procedure, Plaintiffs seek a declaration of the rights of the class members and the liabilities of ACA under the Policies, and specifically, whether ACA has "further liability or obligation" under the Policies, as ACA has denied.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment as follows:

a)    An Order from this Court certifying the class, pursuant to F.R.C.P. 23, certifying Plaintiffs as representatives of the Class, and designating their counsel as counsel for the Class;

b)    A declaration of the rights of the class members and the obligations of ACA under the Policies;

c)    An award of compensatory and other applicable damages;

d)    An award of punitive or exemplary damages in an amount sufficient to punish and deter ACA and others from similar wrongdoing;

e)    An award for all costs incurred by the Plaintiff and the class members in pursuing this action;

f)     An award for attorneys fees and expenses;

g)     An award for interest at the legal rate for the sums of compensatory damages; and

h)     For such further relief as this Court may deem just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL FACTUAL ISSUES.**

RESPECTFULLY SUBMITTED this the 10th day of January, 2012.

By: _____*s/ Jesse Mitchell, III*_____

JESSE MITCHELL, III (MSB# 103020)
O. STEPHEN MONTAGNET, III (MSB# 10049)
WILLIAM M. QUIN, II (MSB# 10834)


*Counsel for Plaintiffs*


OF COUNSEL:

MCCRANEY MONTAGNET & QUIN, PLLC
602 Steed Road, Suite 200
Ridgeland, Mississippi 39157
Telephone:     (601) 707-5725
Facsimile:     (601) 510-2939

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ *Jesse Mitchell, III*
Jesse Mitchell, III