UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

JAMES E. DAVIS AND FRANCOIS KOHLMANN,
INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED                          PLAINTIFFS

vs.                          CAUSE NO. 3:11-CV-093-MPM-SAA

ACA FINANCIAL GUARANTY
CORPORATION, and
JOHN DOES One through Ten                          DEFENDANTS.

**DEFENDANT ACA FINANCIAL GUARANTY
CORPORATION'S REPLY MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT
<u>AND TO STAY ALL CLASS CERTIFICATION PROCEEDINGS</u>**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................1

    REPLY POINT I
        THE ORIGINAL BONDS HELD BY PLAINTIFFS WERE
        CANCELLED BY THE ISSUER'S APPROVED PLAN. THIS IS FACT,
        NOT "FANTASY." ................................................................................................ 1

    REPLY POINT II
        THE ENHANCED CUSIP NUMBER IS ONLY A BOOK ENTRY
        SHOWING THE ORIGINAL BONDS THAT WERE CANCELLED
        WERE "WRAPPED" BY A CBI AND POLICY. IT IS A NOT A
        SEPARATE SECURITY, IT CREATES NO ADDITIONAL RIGHTS IN
        PLAINTIFFS AND IT DID NOT NEED TO BE CANCELLED.......................... 3

    REPLY POINT III
        ALTERATION OF THE UNDERLYING DEBT EFFECTS A
        DISCHARGE OF THE SURETY UNDER NEW YORK LAW........................... 6

    REPLY POINT IV
        THERE HAS BEEN NO ANTICIPATORY REPUDIATION. ............................. 7

    REPLY POINT V
        ACA DID NOT CONSENT TO, HAD NO CONTROL OVER AND
        COULD NOT BLOCK APPROVAL OF THE PLAN WHICH
        ADVERSELY AFFECTED ACA'S RIGHTS. ....................................................... 8

CONCLUSION ..............................................................................................................................10

# **TABLE OF AUTHORITIES**

**Federal Cases**

*Compagnie Financiere, etc. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    188 F.3d 31 (2d Cir. 1999)..................................................................................................9

*Jacobson v. Metro. Prop. & Cas. Ins. Co.*,
    2010 U.S. Dist. LEXIS 135564 (N.D.N.Y. Dec. 21, 2010).......................................................7

*United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*,
    369 F.3d 34 (2d Cir. 2004)..................................................................................................8

**State Cases**

*Kelly,* 186 N.Y. 16 (1906)..............................................................................................................8

*Oppenheimer AMT-Free Municipals v. ACA Financial Guaranty Corp.*,
    36 Misc. 3d 1229A at fn. 4 (Sup. Ct. N.Y. Co. 2012), *appeal pending* ................................3, 6

**Federal Statutes**

Chapter 9 of the Bankruptcy Code................................................................................................2

**PRELIMINARY STATEMENT**

Plaintiffs portray themselves as "retirees" who purchased "one of the safest investments available in our dismal economy," municipal bonds insured by Defendant ACA Financial Guaranty Corporation ("ACA"). (Pltfs' Response 1) [1] In fact, Mr. Davis bought his way into this lawsuit only <u>after the Issuer's default</u>[2] <u>and the Bankruptcy Court's confirmation of the Issuer's Plan</u> on April 1, 2011, gambling that he might be able to recover from ACA amounts that would be due under the Policies had the Original Insured Bonds not been cancelled. It is undisputed that Mr. Davis purchased his Original Insured Bonds only after the Bankruptcy Court's approval of the Plan that would cancel those Bonds, and at a steep discount, *i.e., at approximately 33% of the original face value of the cancelled Original Insured Bonds.* (Saltaformaggio **Ex.17**)

**REPLY POINT I**

**THE ORIGINAL BONDS HELD BY PLAINTIFFS WERE CANCELLED BY THE ISSUER'S APPROVED PLAN. THIS IS FACT, NOT "FANTASY."**

Plaintiffs seek to avoid the effect of the undeniable cancellation of the Original Insured Bonds and their exchange for materially different New Bonds in the Issuer's Bankruptcy proceedings, by repeatedly saying (incorrectly) that "Plaintiffs' Securities have clearly not been cancelled," "Plaintiffs' Securities had not been cancelled," the "Enhanced CUSIPs identify unique Securities 'insured under the policy' that have not been cancelled," "Plaintiffs' Securities have not been replaced, exchanged or cancelled," and calling ACA's position "imaginary" and a "'cancellation' fantasy." (Pltfs' Response, 20, 21, 22, 24) The cancellation is fact, not fantasy.

---

[1] "Plaintiffs' Response in Opposition to Defendant's Motion to Dismiss Plaintiffs' Amended Complaint and to Stay All Class Certification Proceedings." (herein "Pltfs' Response __")

[2] Plaintiffs say they "acquired the *insured* bonds for the express purpose of protecting themselves against the risk that the Issuer may default on the bond payments someday." (Pltfs' Response 1). This is plainly not so. The default had already occurred in January 2010 and the Issuer filed for Bankruptcy on June 24, 2010. (Pltfs' Response 7)

Plaintiffs concede, as they must, that "The Issuer's Bankruptcy Plan identified certain bonds that were scheduled for 'cancellation and exchange'," and they quote from the April 22, 2011 Notice of Plan Confirmation that the specified bonds "will be mandatorily exchanged for restructured bonds (the '2011 bonds') . . . with the exchange to occur on April 25, 2011, or as soon thereafter as is practicable. . . ."(Pltfs' Response 8)

Plaintiffs' nevertheless claim (incorrectly) that "ACA has supplied this Court with no document or evidence supporting the supposed 'undisputed fact' that Plaintiffs' Securities were actually cancelled or exchanged." (Pltfs' Response 20) Plaintiffs ignore the following:

- The First Amended Plan For Adjustment of Debts states in Article IV – Means of Implementing the Plan, that, "The terms of the Bonds are amended and restated by the Debtor in the Amended Trust Indenture. <u>Upon issuance of the Amended and Restated Bonds, the Bonds will be cancelled.</u>" (Saltaformaggio Ex.7, p.10; emphasis added)

- The New Bonds were issued in the reduced aggregate principal amount of $150,150,650. (Saltaformaggio Ex. 7 and Ex. 8)

- The Order Confirming Debtor's First Amended Plan For Adjustment of Debts Pursuant to Chapter 9 of the Bankruptcy Code, entered April 1, 2011, states that "Under the Plan, the Bonds owned by Bondholders will be modified, amended and restated and the certificates of indebtedness evidencing the Bonds will be exchanged for the Amended and Restated Bonds." (Saltaformaggio Ex. 9)

- The Bond Trustee's April 22, 2011, Notice of Plan Confirmation included an "Exchange Table" that allowed bondholders to determine the exchange rate of their Original Bonds for the New Bonds and identified the new CUSIP numbers evidencing the New Bonds. (Saltaformaggio Ex. 10)

The ACA Policy's Terms Agreement, as well as the Policy Declarations, specifically describe the Bonds that are the subject of the Policies and include their CUSIP numbers. (Saltaformaggio Ex. 3) Only the Issuer's obligations <u>under those specifically identified Bonds were insured by ACA</u>. Those Bonds no longer exist.

They were cancelled and replaced by New Bonds that ACA did <u>not</u> insure and that were issued in different aggregate principal amounts, with different maturity dates, interest rates,

2

payment terms, flow of funds and subordination provisions, covenant provisions, default provisions, remedies, denominations and CUSIP numbers. These are indisputable facts, not "a definitional sleight-of-hand" as Plaintiffs call it. (Pltfs' Response 2)

## REPLY POINT II

### THE ENHANCED CUSIP NUMBER IS ONLY A BOOK ENTRY SHOWING THE ORIGINAL BONDS THAT WERE CANCELLED WERE "WRAPPED" BY A CBI AND POLICY. IT IS A NOT A SEPARATE SECURITY, IT CREATES NO ADDITIONAL RIGHTS IN PLAINTIFFS AND IT DID NOT NEED TO BE CANCELLED.

Plaintiffs say Exhibit A to ACA's Policy (Saltaformaggio Ex. 3) identifies the Issuer's Obligations and lists both CUSIP #20786LAA9 [the Original Bonds] and Enhanced CUSIP #20786LCS8 [showing the Bonds as insured by ACA's policy]. (Pltfs' Response 4, 21).

Plaintiffs use the fact that both numbers appear in Exhibit A as the launching pad for their argument that the Enhanced CUSIP #20786LCS8 supposedly identifies a "unique Security" insured by ACA that "was never marked for cancellation," has "not been cancelled" and was "*traded separately from the other non-insured bonds.*" (Pltfs' Response 9, 21-22) Plaintiffs also claim they "have not surrendered their interest in the CBIs [certificates of bond insurance] or in their book-entry positions." (Pltfs' Response 16) This is completely incorrect and misleading.

First, the Enhanced CUSIP number is not a Bond or other form of negotiable "Security." It does not evidence any contractual debt or other obligation of the Issuer. It is a "book entry" that is "used by financial institutions and investors to identify . . . the 'wrapped' Original Bonds and the issuance by ACA of CBIs [certificates of bond insurance] and policies."[3] The Enhanced CUSIP number merely evidences the Original Bonds, as "wrapped" by ACA's insurance, that

---

[3] *See Oppenheimer AMT-Free Municipals v. ACA Financial Guaranty Corp.*, 36 Misc. 3d 1229A at fn. 4 (Sup. Ct. N.Y. Co. 2012), *appeal pending* (Saltaformaggio Ex. 15); http://www.naic.org/documents/svo_naic_public_listing.pdf].

3

were cancelled under the Amended Plan as approved by the Bankruptcy Court's order. (Saltaformaggio Ex.7 at p.10; Ex. 2 at pp. 34, 48-49)

Second, the fact that the Enhanced CUSIP numbers were not specifically identified as having been cancelled on the books of the Custodian when the Original Bonds were exchanged for New Bonds (Cplt. ¶¶ 15, 17, 78) is utterly irrelevant. The Original Bonds, identified by the original CUSIP numbers, were cancelled, and it is only those Bonds that ACA insured. When the Original Bonds were cancelled, ACA's liability thereunder terminated and the Enhanced CUSIP number ceased to have any meaning. Its continued presence on the books of the Custodian did not create any new obligations for the Issuer or ACA. Plaintiffs either misunderstand the meaning and effect of the Enhanced CUSIP number or are deliberately seeking to mislead this Court.

Third, on page 2 of their Response, Plaintiffs say they "purchased *Securities* insured by ACA against payment defaults of the Issuer." Their fn.2 states, "The term securities means and encompasses the bonds identified by CUSIP number 20786LCS8 … [and] refers collectively to the insured bonds identified by the Enhanced CUSIP number 20786LCS8, ACA's Secondary Market Policies, and most importantly, ACA's Certificates of Bond Insurance that were issued relating to the insured bonds identified by Enhanced CUSIP numbers [including #20786LCS8]." (Pltfs' Response 2, fn.2) Whatever the undefined term "securities" may mean, ACA did not insure the book entry given Enhanced CUSIP No. 20786LCS8.

While Exhibit A to ACA's Policy, which identifies the Issuer's "Obligations," refers to both CUSIP No. 20786LAA9 and Enhanced CUSIP No. 20786LCS8 (Pltfs' Response 4), CUSIP No. 20786LAA9 is the only Bond ("security") that was insured under the Policy.

4

Enhanced CUSIP No. 20786LCS8 merely represents the Bond identified by CUSIP No. 20786LAA9 as "wrapped" by the Secondary Market Insurance Policy and CBI. When Bond No. 20786LAA9 was cancelled by the Issuer, with the concurrence of the bondholders (acting through the Trustee in the bankruptcy proceeding), there was nothing left for ACA to insure under the Policy. Although the Policy was not cancelled, and therefore the Enhanced CUSIP number remained outstanding, it no longer had any purpose. This is the fallacy of Plaintiffs' "policy cancellation" argument that appears throughout Plaintiffs' Response.

<u>Fourth</u>, it is irrelevant that "Plaintiffs have not 'surrendered their interest in the certificates of bond insurance [CBIs] or in their book-entry positions' or 'waived their right to receive payment'" under the Original Insured Bonds.[4] (Pltfs. Response 16) The "Notice of Plan Confirmation and Mandatory Exchange" states that "as part of the exchange of the Bonds for 2011 Bonds, this exchange will take place on the records of the depository Trust Company and <u>will not require you to take further action to conclude the exchange</u>." (Saltaformaggio Ex. 10, p.3; emphasis added) Plaintiffs did not have to surrender their Bonds to complete the "mandatory exchange."

The CBIs expressly state ACA's guarantee of payment is "subject to the terms of the Policy" (Saltformaggio Ex. 19), which identifies the Original Bonds by CUSIP #20786LAA9. Those are the only Bonds ACA insured. When they were cancelled, ACA's guarantee of

---

[4] Plaintiffs say "Original Insured Bonds" is "a term that ACA invented solely for purposes of its motion" that "intentionally misrepresents policy definitions," is "a brazen attempt to mislead the Court" and demonstrates ACA's "bad faith" in denying coverage. (Pltfs' Response 17 and fn. 58, 20) However, Plaintiffs deliberately ignore fn. 3 on p. 2 of ACA's Memorandum of Law in Support of its Motion to Dismiss which clearly states that the terms are "used for clarity and convenience" and "are not defined terms in the Policy." It is Plaintiffs that are attempting to mislead the Court by their reckless and unfounded charge.

payment terminated and the CBIs ceased to have any more meaning than German WW II War Bonds.

Plaintiffs seek to bolster their "no cancellation" argument by saying that "on July 15, 2011 (months after the supposed cancellation date), *ACA purchased $25,000 of the Insured Securities*." (Pltfs' Response 22) This contention cannot assist Plaintiffs.

ACA did not purchase any "Insured Securities." Rather, on July 15, 2011 ACA purchased certain CBIs relating to one of its policies covering the Original Insured Bonds for $25,000. (Pltfs' Response 22) This was the result of a clerical oversight, as is made clear by the fact that one week earlier, "on July 7, 2011, ACA responded to the July 6 Notice of Nonpayment sent by the Trustee by stating that pursuant 'to the terms of the Plan and by operation of law, the Bonds were exchanged for new obligations of the issuer . . . and were effectively cancelled.'" [5]

## REPLY POINT III

### ALTERATION OF THE UNDERLYING DEBT EFFECTS A DISCHARGE OF THE SURETY UNDER NEW YORK LAW.

Without citation to any New York (or other) authority, Plaintiffs boldly claim that "in order for alteration of any underlying debt to affect [sic] a discharge of a surety, the alteration must be the result of an agreement freely entered into by the obligee and the principal obligor. (Pltfs' Response 25) They follow this ipse dixit assertion by saying that since, "in bankruptcy, an individual creditor's rights are *involuntarily* adjusted for the betterment of all creditors, . . . ACA's reliance on non-bankruptcy cases involving true voluntary alterations of traditional guaranteed obligations is misplaced." (Pltfs' Response 25) No authority is cited for this proposition.

---

[5] See Reply Affidavit of Carl B. McCarthy, Esq., dated Feb. 7, 2012, quoted from by Justice Ramos in the *Oppenheimer* decision. (Saltaformaggio Ex. 15)

Plaintiffs also claim that "ACA gave advance consent to any arrangement that may impair ACA's ability to collect." (Pltfs' Response 28) That is not so.

As the only support for their claim, Plaintiffs quote from a provision of ACA's Policy that deals with the remedies of a Holder or Owner:[6] "Following any default by the Insurer in the payment of any amounts due under this Policy . . . ." (Pltfs' Response 28-29) Plaintiffs' say, <u>citing no authority</u>, that "Under New York law, this language [somehow] *operates* as ACA's advance consent to any future event that would impair Plaintiffs' ability to collect against the Issuer." That is not correct.

## **REPLY POINT IV**

## **THERE HAS BEEN NO ANTICIPATORY REPUDIATION.**

Plaintiffs say, "ACA does not dispute that it anticipatorily repudiated obligations to make payments as they would have come due." (Pltfs' Response 29) This is sheer nonsense. ACA has vigorously disputed that it repudiated the Policy. At page 18 of its Memorandum of Law in Support of its Motion to Dismiss, ACA stated that "since ACA has no payment obligations under the Policy, future or otherwise, there is no breach of contract and, therefore, no basis for Plaintiffs' claim of anticipatory repudiation." Moreover, ACA noted that under settled New York law, a denial of coverage by an insurer based on its interpretation and application of the express terms of the policy of insurance is not a repudiation. Rather, the insurer is "standing on the policy," not repudiating it, as explained in *Jacobson v. Metro. Prop. & Cas. Ins. Co.*, 2010 U.S. Dist. LEXIS 135564, at *11-12 (N.D.N.Y. Dec. 21, 2010).

---

[6] "Following any default by the Insurer in the payment of any amounts due under this Policy, each Holder or Owner, as the case may be, shall have the right to proceed directly and individually against the Insurer in whatever manner such Holder or Owner deems appropriate and shall not be required to act in concert with any other Holder or Owner or the Custodian." (Saltaformaggio Ex. 3 at 2)

7

The Court of Appeals' decision in *Kelly,* 186 N.Y. 16 (1906), is still the law of New York, despite Plaintiffs calling it "dated and inapplicable authority." (Pltfs' Response 30)

### REPLY POINT V

### ACA DID NOT CONSENT TO, HAD NO CONTROL OVER AND THUS COULD NOT BLOCK APPROVAL OF THE PLAN WHICH ADVERSELY AFFECTED ACA'S RIGHTS.

The following facts are undeniable: at no time did ACA explicitly or impliedly consent to the cancellation and exchange of Bonds and other provisions of the Issuer's Plan, and ACA did <u>not</u> vote in favor of the Plan. While ACA was aware of the cancellation and exchange of Bonds, that does not mean it consented to it. Notice is not consent.

The cases relied on by Plaintiffs (Pltfs' Response 26-28) are readily distinguishable on their facts. *United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.,* 369 F.3d 34, 62 n.23 (2d Cir. 2004), involved performance bonds on two massive naval construction projects that encountered delays and cost overruns. The obligees amended their contracts to make direct and advance payments to the Consortium of contractors. The Second Circuit, agreeing with the District Court, found that "the Sureties <u>were not prejudiced in any way</u> by the amendments to the Contracts" (*Id.*, at 65-66; emphasis added), and that "the Obligees had no reasonable alternative but to maintain the status quo by requiring the Consortium to continue working on the Projects, pursuant to new, post-default financial arrangements." (*Id.*, at 65)

Here, ACA did not consent to the Plan, whose changes were undeniably prejudicial to it <u>as a matter of law</u> by, *inter alia,* subordinating ACA's rights to cash flows under the Original Insured Bonds to the SCDOT's right to those same cash flows under the New Bonds, as well lowering the Debt Service Coverage Ratio and altering the remedy provisions that were in place for the Original Insured Bonds. (Saltaformaggio **Ex. 7, Appx. E** and **Ex. 14**) The Issuer had a number of other options for dealing with its debt. It did not have to choose, and the Trustee did

8

not have to agree to, an approach that operated to ACA's detriment -- by issuing the New Bonds that granted SCDOT priority in the flow of funds; *e.g.*, it could have reduced the number of bonds outstanding or reduced the principal at maturity, leaving all other rights intact.

In *Compagnie Financiere, etc. v. Merrill Lynch, Pierce, Fenner & Smith Inc*., 188 F.3d 31 (2d Cir. 1999), the subject guarantee agreement contained an explicit "general waiver of defenses." *Id.,* at 33, 36-37. <u>ACA's Policy contains no express or implied waiver of its defenses</u>. Moreover, the Guarantee Agreement in *Compagnie Financiere* allowed the obligee to sue the guarantor after a default <u>by the obligor</u>. That is a completely different situation than that dealt with in the ACA Policy provision Plaintiffs quote at the bottom of p. 28 – "any <u>default by the Insurer</u> …" Plaintiffs are wrong to say "ACA gave advance consent to any arrangement that may impair ACA's ability to collect," or otherwise adversely affect its rights. (Pltfs' Response 28)

ACA took on the risk of the Issuer's bankruptcy, and would have been required to perform had the Bankruptcy Court reduced the number of bonds, or reduced the maturity value of the zero coupon bonds, but otherwise left the terms of the bonds unchanged. It did not, however, take on the risk that the SCDOT would push through a "sweetheart" deal that improved its position, to the detriment of subrogation rights of ACA, or of the holders of unwrapped bonds and that otherwise materially and adversely affected its rights without its consent.

Finally, Plaintiffs are also wrong to say that ACA "had the contractual right to 'control' [the bankruptcy proceeding] at its election." (Pltfs' Response 27) ACA had no such right. The Trustee, on behalf of the owners of the Original Bonds, voted to approve the Issuer's Plan. ACA had no right to vote in the bankruptcy any Original Bonds that it insured, either through (1) any right to direct the Trustee how to vote the Original Bonds it insured or (2) in the bankruptcy directly as a holder of Senior Bondholder Claims, the class of creditors that comprised the

9

holders of the Original Bonds.[7] Thus, ACA could not block approval of the Plan and certainly cannot fairly be equated with a lazy or "indifferent, unseeing surety who fails to help himself," or one that chooses to "rest supinely, close his eyes, and fail to seek important information," as Plaintiffs portray ACA. (Pltfs' Response 26, fn. 85-87)

## CONCLUSION

ACA respectfully requests the Court to enter an order dismissing all of the claims in the Amended Complaint; <u>alternatively</u>, staying all proceedings, including discovery, relating to class-certification pending the Court's ruling on ACA's motion to dismiss.

RESPECTFULLY SUBMITTED, this the 11th day of January, 2013.

|  |
|---|
| /s/David W. Clark |
| David W. Clark (MBN 6112)<br>Erin Saltaformaggio (MBN 103999)<br>BRADLEY ARANT BOULT CUMMINGS LLP<br>One Jackson Place, 188 E. Capitol Street,<br>Suite 400<br>Jackson, Mississippi 39201<br>Tel.: (601) 948-8000  Fac.: (601) 948-3000<br>*Attorneys for Defendant ACA Financial Guaranty Corporation* |

---

[7] ACA came into possession of $3.9 million par amount of Original Bonds in January 2011 (*prior* to their exchange into New Bonds) through subrogation rights following a claim payment by ACA in an amount representing unpaid principal that was due and payable. (Saltaformaggio **Ex. 18**). ACA did not vote these Original Bonds in the bankruptcy proceeding; even if ACA had voted them, they represented approximately 1.5% of the total outstanding senior bond indebtedness as of the time of the bankruptcy vote – hardly an amount that could "control" or make any difference in the Trustee's determination of the outcome.

10

**CERTIFICATE OF SERVICE**

I hereby certify that on January 11, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will deliver copies to all counsel of record.

                                        /s/ David W. Clark
                                        DAVID W. CLARK