## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**JAMES E. DAVIS, ET AL.**

**PLAINTIFFS**

**VERSUS**                                    **CIVIL ACTION NO: 3:11CV-093-MPM-SAA**

**ACA FIANCIAL GUARANTY CORPORATION**
**AND JOHN DOES One through Ten**                    **DEFENDANT**

## DEFENDANT ACA FINANCIAL GUARANTY CORPORATION'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS
## MOTION TO DISMISS CERTAIN OF PLAINTIFFS' CLAIMS

This action is brought by Plaintiffs as holders and beneficiaries of an ACA Secondary
Market Insurance Policy that insures the Issuer's payment obligations under securities
specifically identified and described in the Policy. Plaintiffs' claims for breach of fiduciary
duty and gross negligence against ACA are ripe for dismissal.

First, Plaintiffs cannot maintain a claim for breach of fiduciary duty because Plaintiffs
fail to allege facts sufficient to support such a claim that Plaintiffs and ACA were engaged in any
relationship beyond an insurer-insured relationship. Second, Plaintiffs failed to allege any legal
duty owed by ACA to Plaintiffs independent from their contractual relationship. As such, these
claims are barred by New York law and should be dismissed.

## STATEMENT OF RELEVANT FACTS

The following facts, of which this Court may take judicial notice,[1] are taken from
allegations in the Second Amended Complaint ("Complaint" or "Cplt.") and documentary evidence

---

[1] In deciding a motion to dismiss, the Court may consider documents referenced in the Complaint, even if not attached thereto. *See Little v. USAA Cas. Ins. Co.*, 2010 WL 4909869, *2 (5th Cir. Apr. 2, 2010). A court may also consider and rely upon matters of public record, such as public filings in other actions, including bankruptcy court actions. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011); *Cinel v. Connick*, 15 F.3d 1338, 1343 n. 6 (5th Cir. 1994).

4/383513.1

referenced therein or integral thereto, as well as from filings in the United States Bankruptcy Court for the District of South Carolina.

**The Original Bonds insured by ACA's Policies.**

In February 1996, the South Carolina Department of Transportation accepted Connector 2000 Association, Inc.'s (the "Issuer") bid to finance and operate a toll access highway connecting interstate highways I-85 and I-385. (Cplt. ¶ 39). In February 1998, the Issuer issued $200,177,680 in Toll Road Revenue Bonds, in Toll Road Revenue Bonds, Series 1998A, 1998B and 1998C (collectively referred to as the "Original Bonds"). The Original Bonds are identified by separate, unique CUSIP numbers, 20786LAA9, 20786LAG6, 20786LAR2, 20786LAU5 and 20786LAW1.[2] (Cplt. ¶¶ 40-41).

In 2001, ACA issued a number of Secondary Market Insurance Policies to insure the Issuer's payment obligations under a limited subset of the Original Bonds that is referred to herein as the Original Insured Bonds. (Cplt. ¶ 45). ACA's rights and obligations are governed by the terms and conditions of its Policies and the Custody Agreement between U.S. Bank National Trust Association, as Custodian (the "Custodian"), and ACA. (Cplt. ¶ 65).

Each Policy references two CUSIP numbers: one identifies the specific Original Bonds insured by that Policy, while the other, an "Enhanced" CUSIP number, is a book-entry position (via the Depository Trust Company), that evidences Certificates of Bond Insurance ("CBIs") for those Original Bonds as enhanced by ACA's insurance Policy. (Cplt. ¶ 47).

---

[2] CUSIP is a registered trademark of the American Bankers Association [http://www.aba.com] and stands for Committee on Uniform Securities Identification Procedures. CUSIP numbers are simply a convention of modern financial markets used by investors, financial institutions and their intermediaries to efficiently identify securities for purposes of trading, settlement and valuation. They are not evidence of any contractual debt or other obligation. All bonds within a Series having the same maturity date will have the same CUSIP number, and each Original Bond, "wrapped" by a Policy and issuance of a Certificate of Bond Insurance ("CBI"), has an "Enhanced" CUSIP number. [*See* Oppenheimer AMT-Free Municipals v. ACA Financial Guaranty Corp., 36 Misc. 3d 1229A at fn. 4 (Sup. Ct. N.Y. Co. 2012), *appeal pending*; http://www.naic.org/documents/svo_naic_public_listing.pdf].

4/383513.1

As set forth in the Policy, "subject to the terms of this [Policy]," ACA agrees to "pay to the Custodian for the benefit of each Holder or Owner, as the case may be, the Amount Due for Payment resulting from the Nonpayment by the Issuer of the Obligations" covered by the respective Policy specifically identified therein. (Cplt. ¶¶ 48-50; Cplt. at Ex. A).

Thus, ACA agreed to pay the shortfall of any amounts due and payable by the Issuer under the Original Insured Bonds that the Issuer failed to pay, but only for the specific securities described in the "Terms Agreement," Exhibit A, attached to the Policy. (Cplt. at Ex. A). The Policy also provides for subrogation rights, *i.e.*, ACA's rights, upon payment by ACA under the Policy, to step into the shoes of the holder of the Original Insured Bonds and assert whatever claims the holder may have with respect to the Issuer's unpaid obligations. (Cplt. at Ex. A).

**ACA was not Plaintiffs' agent in the Bankruptcy Action.**

Plaintiffs concede the following Policy provision is a condition to ACA's payment obligations (Cplt. ¶ 72 (emphasis added)) provides:

> In any event of a Nonpayment, the Custodian shall make a claim for payment under this Policy. <u>In order to receive payments hereunder, the Custodian</u> as the attorney in fact of the Holder or Owner, as the case may be, . . .<u>shall appoint the Insurer as the agent of such Holder or Owner and of the Custodian in any legal proceedings relating to the Obligations.</u>

Nowhere in Plaintiffs' Complaint do they allege compliance with this condition. Nor, as demonstrated by the pleadings filed in the Bankruptcy Action, can they.

**The Original Insured Bonds were cancelled and exchanged for New Bonds with materially different terms.**

On June 24, 2010, the Issuer filed a voluntary petition for relief under Chapter 9 of the Bankruptcy Code[3] (the "<u>Bankruptcy Action</u>") (Cplt. ¶ 95).

---

[3] Chapter 9 permits a municipality to restructure and adjust its debts. 11 U.S.C.A. § 901.

As stated in the Issuer's Disclosure Statement, "claims on the [Original] Bonds are deemed accelerated on the Petition Date" (Declaration of Erin Saltaformaggio ("Declaration") Ex. 1, p.33).[4]

Thereafter, U.S. Bank National Association, as Trustee for the Senior Bondholders (the "Bond Trustee"), appeared in the Bankruptcy Action on behalf of all the Series 1998A and Series 1998B Original Bond holders (including Plaintiffs). (Declaration Ex. 2 and Ex. 3). The Bond Trustee, on behalf of all such holders of the Original Bonds (including Plaintiffs), filed a proof of claim for $237,834,413, representing the total liquidated amount of the Original Bonds, plus interest, other charges and attorneys' fees. (Declaration Ex. 3).

The Bond Trustee did not represent ACA or its interests in the Bankruptcy Action. In fact, pursuant to the Custody Agreement, the Bond Trustee was not empowered to represent ACA. (Cplt. at Ex. A § 4.04(a)[5]).

As set forth in the Issuer's Plan, the owners of the Original Bonds were to be issued new Series 2011A Bonds and Series 2011B Bonds to refund the Original Bonds. (Declaration Ex.). These bonds were issued in the reduced aggregate principal amount of $150,150,650. (Declaration Ex. 4 and Ex. 5).

The Plan further provided that "Upon issuance of the Amended and Restated Bonds (the New Bonds), the [Original] Bonds will be cancelled" (Declaration Ex. 4, p.10). The Plan also contained a release by the owners of the Original Bonds of any and all claims against the Issuer relating in any way to the Original Bonds. (Declaration Ex. 4, p. 16).

---

[4] Regardless of any "acceleration" of claims on the Original Insured Bonds in the Issuer's bankruptcy, ACA's Policy payment obligations, if any, on the maturity dates of the zero-coupon bonds were not accelerated. "There shall be no acceleration payment due under this Policy except at the sole option of the Insurer" (Cplt. at Ex. A). ACA did not exercise that option.

[5] "The Custodian is not authorized hereunder to proceed against any Issuer in the event of a default under the related Indenture and has no fiduciary or other power or obligation hereunder to assert any of the rights and privileges of the related Holders." (Cplt at Ex. A, § 4.04(a)).

4

**The Custodian and Plaintiffs made claims for sums under the cancelled Original Insured Bonds.**

The Custodian sent ACA a Notice of Nonpayment, under the Policy, making a claim for $82,556.25 for interest purportedly due as of July 1, 2011, under the Original Insured Bonds bearing CUSIP No. 20786LAA9. (Cplt. ¶ 120).

Since ACA's subrogation rights under the Original Insured Bonds were, in essence, eviscerated, without its consent in the Bankruptcy Action, the Custodian proposed to assign ACA certain rights in the bonds issued in the Bankruptcy Action, including the right to potentially receive certain future payments due under an unspecified portion of these bonds. (Declaration Ex. 6). Because the Policy, does not contemplate assignment to ACA of rights under _different_ bonds with _different_ terms in exchange for payments due under the Original Insured Bonds, ACA responded to the Custodian on July 7, 2011 (Declaration Exs. 3, 13; Cplt. ¶ 123 (emphasis added))[6], stating, in pertinent part, that:

> … As you are aware, the issuer of the Bonds successfully confirmed a Chapter 9 plan (the "Plan"), and emerged from its bankruptcy proceeding on April 1, 2011. Pursuant to the terms of the Plan and by operation of law, the Bonds were exchanged for new obligations of the issuer (the "New Obligations") and were effectively cancelled. As a result, the Bonds are no longer enforceable obligations, and as such, neither is the guaranty obligation originally provided by ACA under the Policy… Because the Bonds are no longer effective or enforceable obligations by virtue of the exchange effected under the Plan, and because the original guaranty issued by ACA in connection with the Bonds under the Policy was not extended under the Plan or otherwise to the New Obligations, ACA has no further liability or obligation under its Policy. [emphasis added].

---

[6] On May 12, 2011, ACA advised holders of the Original Insured Bonds that they should review the Bond Trustee's April 22, 2011 notice to determine the "new underlying Exchange Bonds that replaced your Insured Obligations," and that ACA intended to "honor Policies, if at all, only in accordance with their specific terms. A determination of the validity and/or enforceability of any particular Policy will be made by ACA at the time a particular claim is made, based on, among other things, the language of the Policy and the facts and circumstances in existence at such time and applicable law." (Declaration Ex. 7).

**Oppenheimer AMT-Free Municipals, et al. v. ACA Financial Guaranty Corporation**

As this Court is well aware, and has addressed in several orders[7], ACA's rights and obligations with respect to its bondholders, including the plaintiffs herein, revolve around and are determined by New York law. On September 3, 2013, the New York Supreme Court, Appellate Division, First Department issued an order in <u>Oppenheimer AMT-Free Municipals, et al. v. ACA Financial Guaranty Corp</u>. ("<u>Oppenheimer Order</u>") that decided critical issues of New York law that apply in this case.

ACA promptly provided a copy of that Order to plaintiffs' counsel in this case.

ACA decided to seek no further appeal of that determination of New York law, and on September 12, 2013 ACA notified plaintiffs' counsel of its decision to honor all of its obligations under the Policies and related documents in accordance with the <u>Oppenheimer</u> Order. This meant that, with respect to the plaintiffs in this case, (i) ACA would be making net payments in arrears to the extent there had been events of Nonpayment on CUSIPs 20786LCS8 (current interest bonds with payments due each January 1 and July 1) and 20786LCU3 (a capital appreciation bond that matured on January 1, 2012), and future net payments on the CUSIP for which there would be future current interest payments (CUSIP 20786LCS8); and (ii) the

---

[7] "[I]f a single court is to decide the unresolved legal issues in this case, then that court would preferably be one with expertise in the areas of law at issue." (Doc. 58 at 3). The Court's "inclination is to follow the lead of the New York court regarding the issues in this case, since they turn largely upon an interpretation of the law of that state." (*Id*). "It appears to this court that the instant case is something of a sideshow to the 'main event' litigation in *Oppenheimer*". (Doc. 89 at 2). "It is thus clear that, at least on a dollar basis, the *Oppenheimer* lawsuit is greatly predominant over this one, and, arguably more importantly, that case is being decided by New York state courts which have both the expertise in and the authority to create new law dispositive of the novel issues in this context." (*Id*). "All parties agree that New York state law controls the instant dispute, and this court has previously expressed its strong inclination to follow the lead of the New York courts in resolving the legal issues in this case." (*Id*).

bondholders will have been brought current and assured of future timely payments under the Policies.[8]

## **ARGUMENT**

Plaintiffs' allegations fail to assert claims for breach of a fiduciary duty because there are no allegations that ACA was appointed the agent for Plaintiffs in the Bankruptcy Action; in fact the documentary evidence clearly evidences that the Bond Trustee acted on behalf of the Bondholders, including Plaintiffs in the Bankruptcy Action.  Second, Plaintiffs' claim for gross negligence fails because Plaintiffs do not allege the existence of a duty independent of the contractual relationship upon which to sustain a claim for gross negligence.  As such, those claims should be dismissed.

**I.      Standard of review on a motion to dismiss.**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do… Factual allegations must be enough to raise a right to relief above the speculative level..." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and a complaint must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

A Court may consider documents "that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003), *see also Little v. USAA Cas. Ins. Co.*, 2010 WL 4909869, *2 (5th Cir. Apr. 2, 2010).  A court

---

[8] Contemporaneous with the filing of this motion to dismiss, ACA files a motion for summary judgment on Plaintiffs' contract related claims.

4/383513.1

may also consider and rely upon matters of public record, including public filings in other actions, including bankruptcy actions. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011); *Cinel v. Connick*, 15 F.3d 1338, 1343 n. 6 (5th Cir. 1994); *Cortez v. Pharia L.L.C.*, 2011 WL 2455724, *2 (S.D. Tex. May 18, 2011); *United Ass'n v. Schmidt*, 2011 WL 766057 (D.N.J. Feb. 24, 2011); *Mercado Azteca, L.L.C. v. City of Dallas, Tex.*, 2004 WL 2058791, *3 (N.D. Tex. Sept. 14, 2004).[9]

## II. Controlling general principles of New York insurance law.

The governing principles of New York law are well settled and include the following:

- New York law governs the issues discussed herein.[10]

- "Where the provisions of the policy `are clear and unambiguous, they must be given their plain and ordinary meaning, and courts should refrain from rewriting the agreement'."[11]

- ". . . if the only reasonable construction is one favorable to the insurer-drafter of the agreement, there should be no reluctance to follow it." [12]

- "An insurance policy should not be read so that some provisions are rendered meaningless."[13]

- The liability of the insurer "cannot be enlarged by implication beyond the express terms of the contract."[14]

---

[9] The exhibits attached to ACA Financial's Motion to Dismiss (and referenced herein) are referenced in Plaintiffs' First Amended Complaint and central to their asserted claims.

[10] The Policy is governed by New York Law, and thus New York substantive law applies to the issues discussed herein. *See Joiner v. Performance Ins. Servs., Inc.*, 2010 WL 5209391 at *4 (S.D. Miss. Dec. 16, 2010) ("under Mississippi choice of law rules, a contract's choice of law provision is generally enforceable").

[11] *United States Fidelity & Guaranty Co. v. Annunziata*, 67 N.Y.2d 229, 232 (1986).

[12] *Loblaw v. Employers Liability Assur. Co.*, 57 N.Y.2d 872, 877 (1982); *Uribe v. Merchants Bank of N.Y.*, 91 N.Y.2d 336, 341(1998)(same).

[13] *County of Columbia v. Continental Ins. Co.*, 83 N.Y.2d 618, 628 (1994).

[14] *Moshiko, Inc. v. Seiger & Smith, Inc.*, 137 A.D.2d 170, 176, 529 N.Y.S.2d 284, 287-88 (1st Dep't), *aff'd*, 72 N.Y.2d 945 (1988).

### III.    Plaintiffs' breach of fiduciary duty claim fails because there was no fiduciary relationship between ACA and Plaintiffs.

Plaintiffs allege "[a]s a condition of payment, ACA was appointed agent in any legal proceeding relating to the insured securities" and that because ACA "paid certain amounts that became due during Connector 2000's Bankruptcy Proceeding", "ACA became the bondholders' appointed agent". (Cplt. ¶¶ 155-157). However these assertions are contradicted by the plain language of the Policies. ACA was never appointed Plaintiffs' agent in the Bankruptcy Action; rather, the Bond Trustee, not ACA, was authorized to act and acted on behalf of Plaintiffs in the Bankruptcy Action.

Furthermore, the three Notices of Nonpayment, which Plaintiffs apparently try to use as an alternative basis for this claim, do not cloak ACA with any blanket or prospective agent status. Rather, by making these payments during the Bankruptcy Action, ACA was given only a limited assignment of rights to seek reimbursement from the Issuer, with respect to those payments only. Therefore, even assuming, this assignment could give rise to a fiduciary relationship, it would have been limited <u>only</u> with respect to the payments made by ACA during the pendency of the Bankruptcy Action. Because Plaintiffs do not seek damages relative to these two payments, Plaintiffs cannot sustain a claim of breach of a fiduciary duty against ACA.

ACA was not in a fiduciary relationship with Plaintiffs. To determine whether a party may bring a breach of fiduciary duty claim, New York courts look at "whether there exists an independent basis for the fiduciary–duty claim apart from the contractual claim". *Legend Autorama, Ltd. v. Audi of Am.*, 2011 WL 2811461 *3 (N.Y. Sup. July 14, 2011). Generally, a fiduciary duty requires "a relationship of confidence, trust or superior knowledge or control, and may exist when one entity is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship." *Id.* Absent this relationship, a claim for

9

breach of fiduciary duty should be dismissed as duplicative of a claim for breach of contract when the claims "arise from the same operative facts and seek the same damages". *Jericho Group, Ltd. v. Herzfeld & Rubin, P.C.*, 2012 WL 1699847 *6 (N.Y Sup. May 15, 2012).

As is evident from the plain language of the Policy, *see infra*, Plaintiffs cannot state a claim for breach of fiduciary duty, because ACA did not owe any duty to Plaintiffs outside the express language of the Policy.

### A. ACA was never appointed Plaintiffs' agent in Issuer's Bankruptcy Action.

Plaintiffs incorrectly claim that ACA was their agent in the Bankruptcy Action and that ACA had an express duty under §§ 4.03(b)(iii) and 4.07 of the Custody Agreement to take whatever steps were necessary in that action to ensure Plaintiffs' continuing right to sue ACA for the full amount of the Original Insured Bonds irrespective of their cancellation. As a factual matter, ACA was never appointed Plaintiff's agent in the Bankruptcy Action, and ACA never had any authority or ability to control Plaintiff's claims in the Bankruptcy Action.

Plaintiffs allege, and thereby admit, that "Under the Policies, and as a condition of ACA's payment, ACA was required to be appointed to act 'as agent for the Holder or Owner' in any legal proceedings relating to the Obligations." (Cplt. ¶ 72, *see also* at ¶¶ 106, 110). The Bankruptcy Action is such a "legal proceeding[] relating to the Obligations." (Cplt. ¶¶ 72, 73). However, Plaintiffs do not – and cannot – allege compliance with the contractual prerequisites to appoint ACA as their agent in the Bankruptcy Action. In fact, this was <u>not</u> done, although the Custodian plainly had authority to do so on their behalf. (Cplt at Ex A, 4.03(b)(iii).

The very contractual provisions Plaintiffs cite for this proposition, *i.e.*, §§ 4.03(b)(iii) and 4.07 of the Custody Agreement, contradict their argument. Sections 4.03(b)(iii) and 4.07 provide, in pertinent part, that:

10

**4.03(b)(iii):** By acceptance of a Certificate of Bond Insurance Position, *each Holder or Owner, as the case may be, designates, appoints, authorizes and directs the Custodian to act as his attorney-in-fact as follows*: … (iii) if and so long as any deficiency exists with respect to the related Insured Obligations, *to appoint, without recourse, the Insurer as agent for the Holder or Owner, as the case may be, and the Custodian in any legal proceeding* with respect to the related Insured Obligations …, *such appointment to be made contemporaneously with the delivery of the notice to the Insurer demanding payment under the Policy…* (emphasis added).)

**4.07:** The Custodian shall promptly notify the Insurer of any notice it receives of (i) the commencement of any Insolvency Proceeding by an Issuer…*Following and to the extent of payment by the Insured under the related Policy, the Insurer <u>may</u> at any time during the continuation of an Insolvency Proceeding control all matters relating to such Insolvency Proceeding…* (emphasis added).)

Significantly, Plaintiffs nowhere allege that, in compliance with these provisions:

- the Custodian appointed ACA as agent for Plaintiffs or any other bondholders in the Bankruptcy Action. Indeed, the Trustee – ***not ACA*** – acted as the exclusive agent for those bondholders; or

- at any time prior to or during the Bankruptcy Action, the Custodian, Plaintiffs or anyone else ever delivered to ACA a notice of non-payment under the Policies for the liquidated amounts due under the Original Insured Bonds or for the amounts claimed by Plaintiff in this litigation;

Absent compliance with each of these provisions, ACA had no contractual right – much less any duty – to control Plaintiffs' claims in the Bankruptcy Action and preserve Plaintiffs' interests by taking steps to prohibit the cancellation of the Original Insured Bonds. Thus, as a matter of law, ACA was never appointed as Plaintiffs' agent under §§ 4.03(b)(iii), 4.07 or any other provision of the Custody Agreement.

Since ACA was never appointed as Plaintiffs' agent in the Bankruptcy Action, ACA had no contractual right – much less any duty – to control Plaintiffs' claims in the Bankruptcy Action and/or protect their rights by trying to avoid cancellation of the Original Insured Bonds. Plaintiffs mislabel ACA as "agent for the bondholders" (Cplt. ¶ 106) and claim (incorrectly) that ACA "had the

11

right to control all matters relating to the Bondholders' interest in the Connector 2000 Bankruptcy Proceedings". (Cplt. ¶ 110).

## B. The Bond Trustee, not ACA, acted on behalf of Plaintiffs in Issuer's Bankruptcy Action.

Despite Plaintiffs' claims, the indisputable documentary evidence shows that the Bond Trustee acted as agent for the bondholders and as a creditor for the entire accelerated amount due on the Original Bonds. (Cplt. at Ex. A, p.1, Ex. 2 Docket Entries 12, 29, 30 & 54). Acting on behalf of the Bondholders, including Plaintiffs, the Bond Trustee filed a proof of claim in the Issuer's Bankruptcy Action for $237,834,413, representing the total liquidated amount of the Original Bonds, plus interest, other charges and attorneys' fees. (Declaration Ex. 4, Appx. D, Claim No. 2).[15]

Since the Bond Trustee acted as Plaintiffs' exclusive agent in the Bankruptcy Action, any complaint Plaintiffs may have concerning the alleged inadequacy of that representation may not be directed at ACA. (Declaration Ex. 2).

## C. The Notices of Nonpayment and Assignment did not create a general agency relationship between ACA and Plaintiffs.

Plaintiffs identify three non-payment notices sent to ACA during the Bankruptcy Action, in January and July 2010 and January 2011. (*See* Cplt at ¶¶ 92, 96, 98).

As an apparent fall-back position, Plaintiffs suggest that these operated as a blanket appointment of ACA as the agent for all bond holders in the bankruptcy proceedings. (Cplt. At ¶¶ 155-157). Plaintiffs' identification of and reliance on these Notices of Nonpayment is a red-herring.

---

[15] In *Oppenheimer*, Justice Ramos found, on these facts, that "the [Bond] Trustee represented the claims of the owners/holders of the Original Bonds . . .". (Declaration Ex. 8 at *14).

The Notices of Nonpayment assign ACA rights <u>only</u> with respect to those payments *made* by ACA. The Notices do <u>not</u> assign ACA any rights with respect to *future* nonpayment by the Issuer. As such, ACA did not receive an assignment of any rights after January 2011, or for anything other than what it had then paid. Furthermore, Plaintiffs do not allege that these notices of non-payment covered the payments that Plaintiffs are seeking from ACA in this litigation, *i.e.*, all payments allegedly due on the Original Insured Bonds that became due and payable on or after July 2011. (*See* Cplt. generally).

Despite the fact that the *Trustee*, as Plaintiffs' agent in the Bankruptcy Action, filed a proof of claim for the entire accelerated amounts that would ultimately come due on the Original Insured Bonds, inclusive of the sums sought in this litigation, no such demand for non-payment was ever made to ACA. Thus, Plaintiffs' reference to the above payments gives them no support, and should be ignored.

## IV. Plaintiffs' gross negligence claim should be dismissed.

Plaintiffs claim for gross negligence fails because there is no allegation of the existence of any duty independent of the contractual relationship between the parties. "Where a party is merely seeking to enforce its bargain, a tort claim will not lie." *Rodriguez v. Allstate Ins. Co.*, 931 N.Y.S.2d 462, 467 (N.Y. Sup. Ct. 2011). As a general matter, parties are prevented from transforming a breach of contract claim into a tort by claiming that a party breached its obligation to comply with the contract. *See Prichard v. 164 Ludlow Corp.*, 831 N.Y.S.2d 362 (N.Y. Sup. Ct. 2006) ("A plaintiff may not convert a simple breach of contract claim into one sounding in tort…unless a legal duty extraneous to the contract has been breached").

Plaintiffs allege only that: "ACA owed duties to Plaintiffs to review, investigate, process, and pay their claims before denying the same". (Cplt. ¶ 151). As such, Plaintiffs have alleged no

extraneous duty owed to them to sustain a negligence claim. *See Wildenstein v. 5H & Co. Inc.*, 97 A.D.3d 488, 950 N.Y.S.2d 3, 7 (N.Y. Sup. Ct. 2012) (dismissing plaintiff's negligence claim for failure to establish a "legal duty independent of the contract itself has been violated"); *Moneygram Payment Systems, Inc., v. Prima Check Cashing, Inc. et al.*, 2006 WL 1594485 *2 (S.D.N.Y. July 9, 2006) (collecting cases in which "a breach of contract can give rise to a tort claim…where the law imposes on a contracting party an independent duty of care as an incident of his relationship with the other party"; *e.g.* common carrier's duty to passengers; fire alarm company's duty to building owner); *Sternstein v. Metropolitan Ave. Dev'p, LLC.*, 2011 WL 2610520 *6 (N.Y. Sup. 2011).

Plaintiffs' claim for gross negligence should be dismissed because Plaintiffs make no allegations that give rise to a legal duty owed to them independent of their contractual relationship with ACA. A legal duty independent of the contract "'must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract.'" *Wildenstein*, 950 N.Y.S.2d at 7. (quoting *Clark-Fitzpatrick, Inc.v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 389 (1987) (affirming dismissal of gross negligence claims because the plaintiff's allegations were "merely a restatement … in slightly different language of the implied contractual obligations asserted in the cause of action for breach of contract). Without allegations of an independent duty, Plaintiffs' claim for gross negligence cannot survive.

## CONCLUSION

As discussed above, Plaintiffs cannot sustain their claims for either breach of a fiduciary duty or gross negligence against ACA and therefore these claims should be dismissed with prejudice.

14

4/383513.1

Respectfully submitted, this the 4th day of October, 2013.

> /s/David W. Clark_____
> David W. Clark (MBN 6112)
> Erin Saltaformaggio (MBN 103999)
> BRADLEY ARANT BOULT CUMMINGS LLP
> One Jackson Place
> 188 E. Capitol Street, Suite 400
> Jackson, Mississippi 39201
> Telephone: (601) 948-8000
> Facsimile: (601) 948-3000
> *Attorneys for Defendant, ACA Financial Guaranty Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2013, I filed the foregoing with the Clerk of Cuourt

using the CM/ECF system, which will send notification of such filing to all counsel of record.

> /s/ David W. Clark_____
> OF COUNSEL

15

4/383513.1